**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-23611-CIV-SIMONTON**

**RCTV INTERNATIONAL CORP.,
et al.,**

      **Plaintiffs/Counterdefendants,**

**vs.**

**MIGUEL ROSENFELD, and PERLA
FARIAS DE ESKINAZI,**

      **Defendants/Counterplaintiffs.**

_____/

**ORDER ON
RENEWED MOTIONS FOR PARTIAL SUMMARY JUDGMENT
ON OWNERSHIP OF COPYRIGHTS**

      This matter is before the undersigned Magistrate Judge upon Plaintiff RCTV's Motion for Summary Judgment, ECF No. [169] and Defendants Farias and Rosenfeld's Cross Motion for Summary Judgment and Response to RCTV's Motion for Summary Judgment, ECF No. [176]. RCTV has filed a combined Reply to its Motion for Summary Judgment and a Response to Defendants' Motion for Summary Judgment, ECF No. [197]. Defendants have a filed a Final Reply, ECF No. [202]. Pursuant to the consent of the Parties, this action has been referred by the Honorable Donald L. Graham to the undersigned for all further proceedings, including trial, ECF Nos. [64] [65]. For the following reasons, the undersigned grants the Plaintiff RCTV's Motion for Summary Judgment and denies Defendants Rosenfeld and Farias' Motion for Summary Judgment.

      **I.**    **INTRODUCTION**

      This case involves copyright and declaratory judgment claims between Plaintiffs RCTV International Corp., ("RCTV Miami') and Radio Caracas Television RCTV, C.A., ("RCTV Caracas") (collectively "RCTV" or "Plaintiff") and Defendants Perla Farias De Eskinazi ("Farias") and Miguel Rosenfeld ("Rosenfeld") related to the creation,

production and distribution of several Venezuelan Telenovelas between the years of 1989 and 2002.  At the request of the Parties, the matter has been bifurcated in order that the Court may first resolve the ownership issue related to those copyrights, with the issue of damages related to any infringement of those copyrights to be determined later, ECF No. [164].[1]  Thus, the sole issue presently before the Court is whether, as a matter of law, the Plaintiff or Defendant Farias, who worked as a script writer for the Plaintiff, is the lawful owner of the copyrights associated with the works at issue.[2]  Based upon the applicable copyright law, as construed in both the United States and Venezuela, for the following reasons, the undersigned concludes that Plaintiff RCTV holds the right to exploit the copyrights at issue.

II.    BACKGROUND

In 1989, Farias, a Venezuelan national, began writing novella screenplays for RCTV Caracas, a Venezuelan television company. ECF No. [169-1] at 2. In that capacity, Ms. Farias created scripts for telenovelas, including the script for "Juana La Virgen" and other works.  From 1989 to 2003, Plaintiff RCTV and Defendant Farias entered into four Venezuelan work agreements to govern their relationship, dating from 1989-1991, 2000-2001, 2001-2002, and 2002-2003.[3] ECF No. [169-1], [169-2], [169-3], [169-4].  Among other things, each agreement purported to assign RCTV several exclusive rights over the given

---

[1] On February 4, 2015, the undersigned granted on the Parties' Joint Motion to Bifurcate. At that time, the Parties indicated that they likely would seek an immediate appeal of the undersigned's ruling on summary judgment regarding the ownership of the copyrights at issue.

[2] The term "Juana and Other Works" means the telenovelas Juana La Virgen, Rubi Rebelde, Cambio de Piel, Anabel, Mis Tres Hermanas, and Ser Bonita No Basta. Counts I and II of Plaintiff's claims are based solely on ownership and infringement of Juana La Virgen.  Defendants' Counterclaim set forth claims for ownership and infringement of "Juana and Other Works."

[3] The parties entered into a Miami work agreement in 2003. ECF No. [169-5].

works, including the exclusive rights of exploitation and adaptation. *E.g., id.* § 2.1.[4]
Unless otherwise stated, there are no material differences among these contract
regarding the issue presented in the present motions.

   In January 2001, RCTV Caracas entered into a Licensing Agreement with RCTV
Miami. The Licensing Agreement allowed for the use, exploitation, reproduction,
distribution, sale, and sub-licensing of several scripts and telenovela/audiovisual works
in the United States and all other countries in the world except for Venezuela, ECF No.
[1].  Juana La Virgen ("Juana") is one of the works that RCTV Miami was granted the
rights to under the terms of the Licensing Agreement.  On June 25, 2001, RCTV Caracas
registered the copyright for authorship, ownership, and all the rights to Juana with the
intellectual property and copyright office in Venezuela.

   On September 23, 2013, RCTV Caracas registered its authorship and ownership
rights to Juana with the United States Copyright Office. On October 8, 2013, RCTV Miami

---

[4] The Contracts between the Parties that are relevant for resolution of this instant matter
are as follows: 1) Writer's Work Agreement between Perla Farias and Corporation
Radiofonica Venezolana, C.A. for the period of July 1989 through July 1991, wherein Ms.
Farias assigned her copyrights for, among other things, unlimited exploitation, and other
rights as described under various Articles  under Venezuelan Copyright Law, ECF No.
[169-1]; 2) Writer's Work Agreement between Perla Farias and RCTV, C.A., between the
period of March 1, 2000 and March 1, 2001, wherein she made the same assignments as
in the 1989-91 contract, ECF No. [169-2].  The contract included a choice of law provision
that stated that the Agreement shall be governed by Venezuelan Law, ECF No. [169-2] at
5; 3) Writer's Work Agreement between Perla Farias and RCTV for the period between
March 1, 2001 and March 1, 2002, ECF No. [169-3].  The contract includes a Venezuelan
choice of law clause, wherein she made the same assignments as in the 1989-91
contract, ECF No. [169-3] at 5;  4) Writer's Work Agreement between Perla Farias and
RCTV, C.A., between the period of March 1, 2002 and March 1, 2003, wherein she made
the same assignments as in the 1989-91 contract, ECF No. [169-4].  The contract included
a choice of law provision that stated that the Agreement shall be governed by
Venezuelan Law, ECF No. [169-4] at 5; 5) Writer's Agreement between Papel Digital LLC,
a United Stated LLC represented by Perla Farias de Ezkinazi and Coral International
Television Corp., also a United States Company, for one year beginning on or about April
22, 2003, with the possibility of automatic one year extensions, ECF No. [169-4] at 2, 5.
The Contract included various assignments made by Farias under both the United States
Copyright Act of 1976, 17 U.S.C. §§ 101-803, and Venezuelan Copyright Law Articles, 15,
59 and 39, ECF No. [169-5] at 3. The contract included a choice of law provision that
stated that the Agreement shall be governed by the legislation of the State of Florida and
Venezuela, ECF No. [169-5] at 5.

filed this instant action alleging that Defendants, allegedly, with malice aforethought, substantially interfered with Plaintiff's rights to the script of Juana and to reproducing any derivative work therefrom, when Defendant Farias, individually and through her agent Defendant Rosenfeld, approached Televisa, S.A. De C.V. ("Televisa"), and made knowingly false statements concerning Plaintiff's rights to Juana. Plaintiff claims that Rosenfeld advised Televisa that Plaintiff does not have rights to Juana, and if Televisa wanted to have the rights to Juana, Televisa had to negotiate directly with Rosenfeld and Farias only.  Plaintiff contends that Televisa relied on the Defendant's misrepresentation and approached the Plaintiff to terminate the contract between them.

Plaintiff RCTV Miami brought five causes of action against the Defendants.  Two of those causes of action, Infringement of Copyright (Count II) and Declaratory Judgment as to Defendant Farias, (Count I) arise under the United States Copyright Act, 17 U.S.C. 101, et seq. The Plaintiff additionally alleged Intentional Interference with an Advantageous Business Relationship (Count III); (2) Tortious Interference with a Contractual Relationship (Count V); (3) Fraud (Count VI ); and (4) Unfair Competition (Count VII).

After the Court denied the Defendants' motion to abstain from decision in this case and dismiss it without prejudice because of, *inter alia*, a similar lawsuit filed in Tachira, Venezuela, and on the basis of forum non conveniens, the Defendants filed an Answer and Counterclaim wherein they added RCTV Caracas as an Defendant to the Counterclaim.  The Counterclaim alleges that RCTV Caracas is entitled to be remitted 60% of the income received by RCTV Miami related to the use and/or broadcast of telenovelas licensed to RCTV Miami.  According to the Counterclaim, Farias and RCTV Caracas are litigating the core issue of ownership of the copyright in Venezuela.  In the Counterclaim, Farias and Rosenfeld seek a declaratory judgment as to "which of the parties has a present and continuing copyright interest in 'Juana La Virgen' and such

other works as were created by Farias as future works when in the employ of RCTV (Caracas)" (Count I), and Defendant Farias also seeks a judgment against RCTV Miami and RCTV Caracas for infringing upon Farias' copyrighted works in violation of 17 U.S.C. § 101, *et seq.*, 501, 504, *et seq.* (Count II).  Farias requests that the Court order the Defendants to recall all copies of the works, issue an injunction restraining further breaches, and an award of damages, interest and attorney's fees.

On October 7, 2014, the Court heard argument, *inter alia*, on Counter-Defendant RCTV's Motion to Dismiss, and realigned Defendant RCTV Caracas with Plaintiff RCTV Miami, ECF Nos. [99] [171].  Counter Defendant RCTV thereafter filed a Renewed and Restated Answer and Affirmative Defenses to Counterclaim, ECF No. [114].

On March 11, 2015, the Court granted the Parties' Joint Motion for Bifurcation and ordered that the issue of ownership of the copyrights be tried first, with the issue of damages, and any remaining issues, being tried thereafter and subsequent to the resolution of any permitted appeal regarding the issue of ownership, ECF No. [164].  The Parties then filed their respective renewed Motions for Summary Judgment on the issue of ownership and after full briefing, oral argument on the Motions was heard, ECF No. [207].  The Parties agreed that the issue of ownership can properly be resolved on the cross-motions, and a trial on this issue is not necessary.  The Court now addresses the law and arguments raised in those Motions.

III.     <u>THE POSITIONS OF THE PARTIES</u>

In the Plaintiff's Motion for Summary Judgment, the Plaintiff generally contends that the right to exploit the works at issue is held by Plaintiff RCTV pursuant to the applicable law and the employment agreements entered into between Defendant Farias and RCTV, ECF No. [169].  In support of this conclusion, Plaintiff first contends that although the works were created in Venezuela, because this action was brought pursuant to the U.S. Copyright Act, U.S. law, rather than Venezuelan law, applies.  Thus, pursuant

to the work-for-hire doctrine, RCTV is the owner of works created during and within the scope of Defendant Farias' employment with RCTV. [5]  The Plaintiff further contends that this conclusion is reached pursuant to the Berne Convention whether the Court follows the "traditional view" of copyright law, or, the "Itar-Tass" approach, because under either, U.S. law still applies and pursuant to the work-for-hire doctrine, the works belong to RCTV.  Further, the Plaintiff contends that as to the audio visual works at issue, as opposed to the scripts, the issue of ownership is determined by the law of the forum where the protection is claimed, and thus the audio visual works are subject to U.S. law and are owned by RCTV, as Defendant Farias' employer.

The Plaintiff argues alternatively, that even if Venezuelan law is applied, RCTV is still the owner of the right to exploit the scripts at issue.  Specifically, the Plaintiff contends that under Article 59 of Venezuelan Copyright Law, "VCL", there is a presumption that the right to exploit works created by an author are assigned to the employer for the lifetime of the author plus an additional sixty years.  Plaintiff asserts that its interpretation of Venezuelan law is based upon the opinion of Plaintiff's expert, Ricardo A. Antequera.  Plaintiff further contends that the Defendants' interpretation of Venezuelan law, which is premised on the contention that Article 52 of the VCL limits the assignment of rights under Article 59 to five years, is incorrect, impractical and is contrary to the policies of U.S. Copyright law.

In their Cross Motion, the Defendants contend that under Venezuelan law, which Defendants contend is the law that should be applied in this matter, "Ms. Farias was always the owner [of those works],[and] RCTV was [a] temporary assignee whose

---

[5] The U.S. Copyright Act, Title 17 U.S.C. § 201 entitled "Ownership of copyright" provides, "(b) Works Made for Hire.--In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."

interest has expired." ECF No. [176] at 20.  The Defendants contend that Venezuelan law applies because the Parties specifically agreed in the employment contracts between the Parties that Venezuelan law would apply.  In addition, the Defendants note that the works were created in Venezuela, by a Venezuelan working for a Venezuelan company and that Venezuela is an "author's rights" country.

In analyzing the VCL, the Defendants concede that there is a potential conflict between Articles 52 and 59.[6]  However, Defendants contend that the conflict must be resolved in favor of the author as directed by Article 90 of the VCL.  Defendants contend that after the 1993 amendments to the VCL, assignments of work made pursuant to Article 59 became limited to 5 years in duration pursuant to Article 52, ECF No. [176] at 14.  The Defendants contend that their expert, Jose Rafael Farinas Diaz, supports this interpretation.[7]  At the hearing on the Motions for Summary Judgment, Counsel for the Defendants conceded that Defendant Farias did not own the audio visual work shot from her script, ECF No. [2-7] at 38.

In Reply, the Plaintiff contends that the Defendants' expert, Farinas Diaz, admitted in prior writings, interviews and during his deposition that Article 59 necessarily assigns the author's rights for the duration of the copyright and is not limited to five years by Article 52, ECF No. [197].  Plaintiff further contends that Article 52 and 59 do not conflict because they are capable of non-conflicting interpretations, and further notes that the 1993 amendments to VCL added additional language to Article 59 which makes it clear that the duration of the assignment is for the life of the copyright.

---

[6]  It is undisputed that Venezuela has no strict rule of stare decisis under the Civil Code of Venezuela and legal analysis is derived from interpretation of the statutes at issue, ECF No. [176] at 11.

[7]  On June 11, 2015, the undersigned granted the Defendants' Motion to substitute Mr. Farinas Diaz for Mr. Marturet as Defendants' expert on Venezuelan law and denied the Plaintiffs' Motion to strike the Defendants' new expert Farinas Diaz, ECF Nos. [188] [208].

In their Final Reply, the Defendants contend that Farinas Diaz's opinion regarding the interplay between Article 52 and 59 is not new and that his prior statements did not state what the correct interpretation of the law was, but rather indicated how the law is being incorrectly applied in Venezuela in the employment assignment context, ECF No. [202].

IV.   **LEGAL FRAMEWORK**

A.   **Summary Judgment Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232 (11th Cir. 2010) (internal quotation marks omitted).  When the only question a court must decide is a question of law, summary judgment may be granted. *Id.* See *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1120 (11th Cir. 2005) ("A summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law."). The interpretation of a contract, or agreement, presents a question of law, see *Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 900 (11th Cir. 2000), as does the determination of whether a contract is ambiguous, see *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1360 (11th Cir. 1988).

B.   **The Berne Convention**

In 1989, Congress passed the Berne Convention Implementation Act of 1988  and the United States joined the Berne Convention for the Protection for Literary and Artistic Works ("Berne Convention"), an international agreement governing copyright law. *Golan v. Holder*, ——— U.S. ———, 132 S.Ct. 873, 877 (2012); *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 48 (5th Cir. 1995).  In relevant part, the Berne Convention states, "authors shall enjoy, . . . in countries of the Union other than the country of origin, the

8

rights which their respective laws . . . grant to their nationals." Berne Convention, art. 5(1), Sept. 9, 1886, as revised at Paris on July 24, 1971 and amended on Sept. 28, 1979, S. Treaty Doc. No. 99-27 (1986). Further, the Berne Convention states that "the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed." *Id.* art. 5(2).

### C.   The United States Copyright Act, 17 U.S.C. § 101 *et seq.*

"To make out a prima facie case of copyright infringement, a plaintiff must show that (1) it owns a valid copyright in the [work] and (2) defendants copied protected elements from the [work]." *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290, 1292 (11th Cir. 2011) citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008).[8] Specifically, courts focus on two distinct points in the chain of title: first, courts determine who *initially* owned the copyright; second, courts determine whether or not the initial owner *transferred* any of their exclusive rights. *Id.* Further, although "copyright infringement that occurs in the United States is governed by U.S. law[,] courts may look to the law of a foreign country where ownership of the work was established or transferred . . . even in the context of a U.S. infringement action." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 102.6 (3d ed. 2014) (citing *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 88-92 (2d Cir. 1998)).

---

[8] The 1976 Copyright Act defines a "copyright owner" as the owner of "any one of the exclusive rights" comprised in a copyright. 17 U.S.C. § 101.There are five exclusive rights pertaining to literary works that are protected under U.S. copyright law, the exclusive rights of 1) reproduction, 2) derivation, 3) distribution, 4) public performance, and 5) public display. *Id.* § 106.The sixth exclusive right – public performance via digital transmission – only applies to sound recordings. 17 U.S.C. § 106(6).

V.  **OWNERSHIP OF THE COPYRIGHTS**

  A.  **Initial Ownership**

    1.    **Choice of Law**

  Under the U.S. Copyright Act, the first step is to determine if a plaintiff owns a valid copyright in the work at issue.  In this case, the Plaintiff contends that under U.S. copyright law, it owns the works at issue because Defendant Farias created those works while working for the Plaintiff.   Defendants, on the other hand, contend that Defendant Farias owns the works at issue because under Venezuelan copyright law, the author of the work is the initial owner of that work.  Thus, the Parties disagree as to whether U.S. law or Venezuelan law applies to determining who owns a valid copyright in the work at issue.  In addition, the Parties disagree as to the conflict of laws analysis that the Court should utilize to determine which country's law should apply.  This determination is significant because both Parties admit that if United States law applies, the Plaintiff prevails because pursuant to § 201, of the United State Copyright Act, the employer is considered the author of any works created in the work for hire scenario and owns all of rights to those works.

  On this issue, the Copyright Act provides no guidance regarding the choice of law. *Id.*  However, as noted by the Plaintiff, prior to 1998, several courts held that pursuant to Article 5 of the Berne Convention, holders of foreign copyrights who sued for infringement in the United States were entitled to a determination of infringement under same rule of law as holders of United States copyrights, ECF No. [169] at 12.  This approach has been termed the "national treatment" principle of the Berne Convention and is the position advanced by Professor David Nimmer, who discussed this principle in his treatise, Nimmer on Copyright § 17.05 (1998).[9]

---

[9] The Plaintiffs herein named Prof. Nimmer as their rebuttal expert for his "expertise" in the "Traditional View" which was considered by the Court in *Itar-Tass*.  The undersigned

However, in *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 88-92 (2d Cir. 1998), the Second Circuit examined the application of the Berne Convention in an international copyright case and parted from the "national treatment". *Itar-Tass* involved copyright infringement claims brought by foreign newspapers against an American newspaper for allegedly copying the former's news articles. The choice of law issue had not been raised by the parties in that action and had not been considered by the trial court.  Instead, the parties and the district court assumed that Russian law applied to the case.  The reviewing Court discussed the "national treatment" principle of the Berne Convention as advanced in Nimmer on Copyright § 17.05 (1998).  In so doing, the Court acknowledged that, "an author who is a national of one of the member states of either Berne or the Universal Copyright Convention, or who first published his work in any such member state, is entitled to the same copyright protection in each other member state as such other state accords to its own nationals." *Id.* at 89.  However, the Court disagreed with the *Nimmer* assertion that the applicable law is the copyright law of the state in which the infringement occurred and not the state of which the author is a national, or in which the work is first published. *Id.*  The Court explained that the second statement failed to distinguish between ownership and substantive rights in asserting which law should govern. *Id.* The Court instead concluded that pursuant to the Berne Convention, although substantive rights, *i.e.,* scope of protection, required the uniform application of that protection to foreign and domestic authors, before reaching the protection provisions of Berne, the Court must first determine the litigant's right or interest in a work eligible for protection under Berne. *Id.* at 89-90.

---

granted the Defendants' Motion to Strike Mr. Nimmer as an expert  witness on domestic law and struck Professor Nimmer's Report, concluding that Professor Nimmer's report was actually a legal memorandum and did not aid the court in resolving domestic copyright law issues, ECF No. [194].

After observing that the United States Copyright Act contained no provision relevant for resolving any conflict of laws issues, the Court determined that it would rely on federal common law to resolve conflict of laws, and stated that not all choice of law determinations were the same for all of the issues raised in copyright actions. *Id.* The Court therefore first determined the conflicts of law rule as to issues of ownership, and then determined the conflict of laws rule for infringement issues. *Id.* at 90-91.  As to the issue of initial ownership, the Court examined the Restatement (Second) of Conflict of Laws § 222, and concluded that because copyright is a form of property, that determination of ownership would be determined by the law of the state with "the most significant relations" to the property and the parties.  *Id.*  The Court held that because the works at issue were created by Russian nationals and first published in Russia, that Russian law, as the law of the "country of origin" as defined in Article (5) 4 of the Berne Convention, was the appropriate source of law to determine issues of ownership. *Id.*

The approach advanced by the Second Circuit in *Itar-Tass* was applied by the Eleventh Circuit in *Saregama India Ltd., v. Mosley,* 635 F.3d 1284 (11th Cir. 2011), a copyright infringement case between two foreign entities.  In *Saregama*, the Court did not apply the national treatment principle, which requires application of United States law to determine the initial ownership of a copyrighted work create abroad.   Instead, the Eleventh Circuit concluded, as did the Court in *Itar-Tass*, that, "Initial ownership of a copyrighted work is determined by the laws in the work's country of origin," *Id.* at 1290.[10] With these principles in mind, the undersigned now addresses the Parties' arguments with regard to initial ownership and transfer/assignment of ownership of the copyrights at issue.

---

[10] Pursuant to 17 U.S.C. § 501(b), only the legal or beneficial owner of "exclusive right" has standing to bring a copyright infringement action in a United States court.

2.      <u>Application of Choice of Law to this Case</u>

In the case at bar, the Parties dispute whether "national treatment" which the Plaintiffs refer to as the "traditional view" or the "*Itar-Tass* approach" should be applied to resolve the choice of law for the issue of initial copyright ownership.  The Plaintiff contends that the "traditional view" that the country's laws where protection is sought, in this case the United States, should govern the issue of initial ownership in this case, ECF No. [169] at 12.  The Plaintiff argues that although the Eleventh Circuit applied the *Itar-Tass* rule in *Saregama*, Nimmer's "traditional view" is nonetheless the correct rule to apply in determining initial ownership of a copyright, and further argues that, the court in *Saregama* did not expressly hold that the *Itar-Tass* rule was the preferred rule over the traditional rule, ECF No. [169] at 12, 22.

Defendants, on the other hand, assert that the *Itar-Tass* rule is not only the correct rule, but also a rule that this Court is bound to follow under the Eleventh Circuit's decision in *Saregama*. ECF No. [176] at 17 n.35.  Defendants further argue that Venezuelan law governs initial ownership because Venezuela is *Juana La Virgen*'s country of origin and the source of law that both parties agreed would govern their writer's agreements. ECF No. [176] at 17-20.

The undersigned concludes that the Plaintiff's argument is unavailing, and fails to recognize that the Court in this matter is bound to follow the Eleventh Circuit's ruling in *Saregama* regarding the determination of initial ownership of the copyright. Thus, as in *Saregama*, the Court finds that the *Itar-Tass* approach rather than the "traditional view" should be followed in determining initial ownership of a copyright and further concludes that the initial ownership of a copyrighted work is determined by the laws in the work's country of origin.[11]  In addition, in this case, there is no dispute that the works at issue

---

[11]  The undersigned notes that if there is no conflict of law, there is no need to decide which source of law applies. *See Saregama*, 635 F.3d at 1292 (avoiding choice of law

for the contracts between 2000 through 2002 were created by Venezuelan nationals, in Venezuela and pursuant to Writer's Agreements executed in Venezuela.  In addition, the Agreements executed between 2000 and 2003, included a Venezuelan choice of law clause.  As such, Venezuela, and thereby its laws, has the most significant relation to the copyrights and the parties. Thus, Venezuela is the country of origin and provides the law for determining initial ownership of the copyrights.

In an attempt to convince the Court that the Itar-Tass rule should not be followed, the Plaintiff cites several cases that Plaintiff claims are supportive of the traditional view, including *Bridgeman Art Library, Ltd., v. Corel Corp.*, 36 F. Supp. 2d 191 (S.D. N.Y. 1999); *Aldon Accessories Ltd. v. Spiegel, Inc.,* 738 F.2d 548 (2d Cir. 1984); *Hasbro Bradley, Inc., v. Sparkle Toys, Inc.*, 780 F.2d 189 (2nd Cir. 1985); *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679; and *Dae Han Video Prods., Inc. v. Kuk Dong Oriental Food, Inc.,* 1990 WL 284748 (D. Md. 1990). *Id.* at 11-16.  *S*pecifically, Plaintiff argues that the courts in *Bridgeman* and *Hasbro* held that U.S. copyright law governs conflict issues regarding the scope of protection. *Id.* at 11, 15. Plaintiff also argues that the court in *Corcovado* held that U.S. copyright law governs the conflict issue regarding transfer of ownership. *Id.* at 15, 17 n.37. Further, Plaintiff argues that the courts in *Aldon* and *Dae Han* applied U.S. copyright law to the issue of copyright ownership. *Id.* at 15. According to Plaintiff, each of these cases' holdings together indicate an implicit understanding of the "traditional view," that U.S. copyright law governs all issues in U.S. copyright infringement actions. *Id.* at 13-16.

Defendants counter Plaintiff's cited cases as having no bearing on the discrete conflict issue of ownership. *Id.* at 20. Defendants do not expressly rebut *Bridgeman* or *Corcovado* in their brief; however, Defendants argue that in *Aldon*, *Hasbro*, and *Dae Han*,

---

analysis for *transfer* of ownership by assuming result would be the same under either source of law, and thus no conflict of law is present).

none of the parties addressed the applicability of any law other than U.S. law. *Id. at* 21-22. Also, in further elaborating on *Aldon*, *Hasbro*, and *Dae Han*, Defendants argue that 1) the court in *Aldon* merely addressed "whether the work made for hire doctrine *applied* to the alleged copyrights," *Id.* at 20-21 (emphasis added); 2) the court in *Hasbro* merely addressed a question of scope of protection, not of ownership, *id.* at 21; and 3) *Dae Han* is distinguishable because, there, the parties did not have a contracted choice of law provision, while here, the parties do have a contracted choice of law provision, *id.* at 21-22. Thus, Defendants argue that, because both Plaintiff and Defendant agreed that Venezuelan law would govern the 2001 Writer's Work Agreement, Venezuelan law should govern the issue of initial copyright ownership. *Id.*

The cases cited by Plaintiff do not alter the Court's conclusion regarding the application of the holding in *Saregama*, and, in fact, do not necessarily endorse the "traditional view."  To the extent that the Plaintiffs contend that this Court should follow the traditional view in applying the dictates of the Berne Convention, neither *Aldon* – a 1984 decision – nor *Hasbro* – a 1985 decision – are supportive because the U.S. did not join the Berne Convention until 1988, which was not in force until 1989, World Intellectual Property Organization (WIPO), WIPO-Administered Treaties: Contracting Parties > Berne Convention, WIPO, http://www.wipo.int/treaties/en/ShowResults.jsp?lang=en&treaty_id=15 (last visited September 28, 2016). Similarly, the court in *Corcovado* was presented with renewal right issues for pre-1978 copyrights. 981 F.2d at 683-85. Because the works in *Corcovado* were created before January 1, 1978, the 1909 Copyright Act – not the 1976 Copyright Act – governed the issues in that case. *See id.* at 680-81 (noting works were created in the 1950s and 1960s). Thus, the Berne Convention would not have had any bearing on *Corcovado*'s reasoning; *Corcovado*'s holding was founded on laws that were enacted and repealed all before the U.S. joined the Berne Convention. Further, *Dae Han* – a 1990

decision regarding Korean works – is not supportive because Korea was not a member of the Berne Convention until 1996. WIPO, *supra* p. 8. Thus, the Berne Convention would not have affected *Aldon*, *Hasbro, Corcovado*, or *Dae Han* because, under their respective governing laws, the U.S. owed no Berne Convention-founded reciprocity to the given foreign nation. The only case that Plaintiff cited that the Berne Convention could have theoretically affected is *Bridgeman*.

The only cases that Plaintiff cited in its brief that directly addressed a conflict of law issue were *Bridgeman*, *Hasbro*, and *Corcovado*. Plaintiff recognizes that *Bridgeman* and *Hasbro* held that U.S. copyright law governs conflict issues regarding the scope of protection. ECF No. [169] at 11, 15. Yet, although the court in *Itar-Tass* held that the laws of a work's country of origin govern issues of initial ownership, it also recognized that U.S. law governs issues regarding the scope of protection, an infringement issue. 153 F.3d at 91 ("United States law would still apply to infringement issues"). Moreover, *Itar-Tass* cited *Hasbro* as representing good law. *Id.* In other words, neither *Bridgeman* nor *Hasbro* are dispositive – both cases are in line with both rules, the "traditional view" and the *Itar-Tass* rule.

Further, Plaintiff argues that the courts in *Aldon* and *Dae Han* applied U.S. copyright law to issues of copyright ownership in a foreign work. ECF No. [169] at 15. The court in *Itar-Tass* addressed *Aldon*, clarifying that *Aldon* was in line with *Itar-Tass*' holding because, in *Aldon*, the United States was the work's country of origin. 153 F.3d at 89 n.4. Similarly, the court in *Itar-Tass* dismissed *Dae Han*. *Id.* n 5. The court noted that *Dae Han*'s reliance on a copyright certificate as *prima facie* evidence was inappropriate because "[i]ssuance of [a copyright] certificate is not a determination concerning applicability of the work-for-hire doctrine." *Id.* Further, the court noted that a copyright certificate is not "a resolution of any issue concerning ownership." *Id.* Thus, neither

16

*Aldon* nor *Dae Han* are persuasively supportive of Plaintiff's argument that courts follow Nimmer's "traditional view."

Plaintiff further argues that, because the Eleventh Circuit in *Saregama* merely applied the *Itar-Tass* rule without expressly directing a holding towards that issue, this Court is free to disregard the Eleventh Circuit's holding in that case. ECF No. [169] at 22. However, Plaintiff did not directly address any substantive reasons why the Eleventh Circuit in *Saregama* is so wrong that this Court should not follow it. Second, as noted above, Plaintiff does not offer any supportive authority for Nimmer's "traditional view." Third, aside from Nimmer's attempted rebuttal expert testimony, *see* ECF No. [112-2], Plaintiff merely asserts – without offering any authority or reasoning of its own – that the "traditional view" is substantively correct.

Further, to the extent the Plaintiff argues that *Itar-Tass* directs courts to engage in a case-by-case analysis of the Second Restatement of Conflict of Law to determine initial ownership, the Plaintiff's contention is without merit. ECF No. [169] at 18-21. Although *Itar-Tass* did itself engage in a Second Restatement of Conflict of Law analysis, *Itar-Tass* subsequently held a more universal rule: the laws of a work's country of origin govern the issue of initial copyright ownership. 153 F.3d at 90-91 n.11. In addition to the Eleventh Circuit, even the U.S. Copyright Office has endorsed the country of origin *Itar-Tass* rule. *See Saregama*, 635 F.3d at 1292 (adopting *Itar-Tass'* holding); *see also Lahiri,* 513 F. Supp. 2d at 1176 n.4 (citing *Itar-Tass,* 153 F.3d at 90); *see also* U.S. Copyright Office, *supra* p. 4, § 102.6 (citing *Itar-Tass*).  Finally, although *Dish Network, LLC. V. TV Net Solutions, LLC.,* No. 6:12-cv-1629-Orl-41TBS, 2014 WL 6685351 *1 (M.D. Fla. Nov. 25, 2104), engaged in a Second Restatement of Conflict of Law analysis, it did so only with respect to the conflict issue of transfer of ownership. 2014 WL 6685351, at *3. *Dish Network*, the case that Plaintiff cites in support of its *Itar-Tass* interpretation, itself

recognized the *Itar-Tass* country of origin rule with respect to the conflict issue of initial ownership. *Id.* Thus, Plaintiff's argument is unpersuasive.

Therefore, this Court follows the *Itar-Tass* rule: the laws of a work's country of origin, in this case Venezuela, govern the issue of initial copyright ownership.

### 3.   Application of Venezuelan Law to Initial Ownership

As the Court has decided that Venezuelan law should apply to the determination of initial copyright ownership as required by *Saregama*, the Court now turns to application of Venezuelan law to the determination of initial ownership.[12]   Under Venezuelan Copyright Law ("VCL"), copyright ownership initially vests in a work's actual creator.

Article 5 of the VCL states that "[t]he author of an intellectual work shall have . . . a right to the work." *Id.* Although the VCL does not expressly state that the author is the work's *initial* owner, the VCL repeatedly implies that it vests ownership in the author at the moment of creation. For example, Article 5 states that a work's author receives the right to the work "by virtue of the mere fact of his creative act." *Id.* Article 6 clarifies the term "creative act," defining it "by the mere fact of the realization of the author's thought." *Id.*  Article 5, further states that the vested moral rights are "inalienable, unattachable, unrenounceable and imprescriptible." *Id.*  This permeates the VCL, such as in Article 10 ("The copyright in works of joint authorship shall belong jointly to the coauthors") and Article 50 ("The right of exploitation . . . may be assigned . . .; it shall however revert to the author or to his successors in title when the rights of the assignee

---

[12] Plaintiff's brief correctly argues that, under U.S. copyright law, Plaintiff would be the initial copyright owner. ECF No. [169] at 13-14, 16. Plaintiff uses this conclusion to circularly argue that *Itar-Tass* is incorrect and that the U.S. statutorily protects foreign works. *Id.* However, the issue addressed in *Itar-Tass* was not whether a foreign work is protected under U.S. law, which it is; *Itar-Tass* addressed the specific issue of what happens when the result of initial ownership under U.S. copyright law is in conflict with that of a work's country of origin. 153 F.3d at 88-90.

expire"). *Id.* at 61, 71.  Here, Defendant Farias actually created *Juana La Virgen* in 2001, ECF No. [104] at 65-67, and Plaintiff is a legal, rather than a natural, person. Therefore, this Court finds that Defendant Farias was the initial owner of *Juana La Virgen*'s copyright.[13]

Plaintiff argues that the VCL vests initial ownership in the hiring party of works that fall under Article 59. ECF No. [169] at 20 n.41.  More specifically, Plaintiff argues that Article 59 provides an immediate statutory presumption of assignment in a work's hiring party, and, thus, a work's hiring party is effectively its initial owner. *Id.* Plaintiff further argues that this presumption is similar to the U.S. presumption of vesting ownership initially in the hiring party of a work made for hire. *Id.* In effect, Plaintiff argues by analogy that, because U.S. copyright law vests such hiring parties with initial ownership, so too must Venezuelan copyright law. *See id.*

Plaintiff's argument is unpersuasive.   Article 59 of the VCL states that "[i]t shall be presumed . . . that the authors of works created in the course of employment relations . . . have *assigned* to [the hiring party] . . . the exclusive right to exploit [the work]." ECF No. [105-5] at 74 (emphasis added). Black's Law Dictionary defines an "assignment" as "[t]he transfer of rights or property." Black's Law Dictionary (10th ed. 2014). Further, Black's Law Dictionary defines a "transfer" as "[a]ny mode of disposing of or parting with an asset or an interest in an asset" as well as "[t]o convey or remove from one place or one person to another." *Id.* In other words, the plain meaning of the word "assign" is for one person to give up their ownership in something and give it to someone else. By using the word "assigned," Article 59 is thus defining the hiring party as a subsequent owner of the right of exploitation, not its initial owner.  Moreover, as discussed below,

---

[13] For purposes of this analysis, the Parties have not distinguished among the various works created while Defendant Farias was employed by RCTV, nor is it necessary to do so at the present time.

Plaintiff's own expert Antequera Hernandez opines that pursuant to Articles 7 and 19 of the VCL, ownership vests in the author, as the creator of the work, ECF No. [112-1] at 5.

Thus, under Venezuelan law, the actual creator of a work is its copyright's initial owner. ECF No. [176] at 6.   Defendant Farias is *Juana La Virgen*'s actual creator and, thus, its initial owner. In 2001, Defendant entered into a work agreement with Plaintiff. ECF No. [104] at 65-67. The work agreement required that Defendant write a screenplay. ECF No. [169-3] § 4.1. In 2001, Defendant co-wrote *Juana La Virgen* with Plaintiff-designated writers. ECF No. [104] at 65-67. In other words, Defendant Farias actually created *Juana La Virgen*. Under the VCL, which implies that the author of a work is its initial owner, ECF No. [105-5] at 60 ("[t]he author of an intellectual work shall have . . . a right to the work"), Defendant Farias is *Juana La Virgen*'s initial owner.[14]

### B.  Transfer of Ownership

After courts determine initial copyright ownership, courts analyze whether the initial owner subsequently transferred ownership of any exclusive rights. *E.g., Saregama*, 635 F.3d at 1290, 1292 (determining the progression of who owned the work's exclusive rights).  In this case, it is undisputed that Defendant Farias assigned, and thereby transferred, at least some portion of her rights to the copyrights to RCTV during the course of her employment with the Plaintiffs.  Akin to the dispute discussed above in relation to the determination of initial ownership of the copyright, the Parties dispute what law should apply to issues related to that transfer, and the possible reversion of the transfer of the copyrights at issue.  For the following reasons, the undersigned

---

[14] On this point, Defendants overstate their proposition. Defendants argue that, under the VCL, the actual creator of a work is *always* its initial owner. ECF No. [176] at 6. Although, as described above, this is technically correct, Defendant's proposition seems to imply that a work's actual creator, and *only* its actual creator, is a work's initial copyright owner. This implicit proposition is too broad. For example, although the author of an audiovisual work's script does not *actually* create the separate audiovisual work, Article 12 establishes a presumption that such a writer is a coauthor and joint owner with any actual creators,  ECF No. [105-5] at 61. Thus, although a work's actual creator is always its author, a work's actual creator is not always its *only* author.

concludes that Venezuelan law also governs the law of the transfer or assignment of the right to exploit the works at issue under the specific and undisputed facts of this case. In addition, the Court concludes the terms of the transfer, i.e. scope and duration are also governed by Venezuelan law.

Although courts have recognized that U.S. law does not necessarily govern all aspects of a U.S. copyright dispute, with the exception of *Dish Network, LLC. V. TV Net Solutions, LLC.,* No. 6:12-cv-1629-Orl-41TBS, 2014 WL 6685351 *1 (M.D. Fla. Nov. 25, 2104), courts in this jurisdiction have yet to rule on a conflict of laws issue with respect to copyright ownership via transfer, *see, e.g.*, *Saregama*, 635 F.3d at 1292 (noting there is "no guiding case law" as to ownership via transfer and declining to decide this conflict of laws issue as unnecessary to the decision in that case). Although there is neither binding nor highly persuasive authority with respect to conflict issues of transfer regarding copyright ownership, the Court notes that courts generally apply the Second Restatement of Conflict of Laws to resolve related disputes. *E.g.*, *id.*

In this regard, the undersigned notes that in this case, Venezuela has the most significant relationship to *Juana La Virgen* with respect to the issue of ownership via transfer, i.e. derivative ownership. First, for the same reasons discussed above in relation to initial ownership, the parties to the transfer or assignment at issue are Venezuelan nationals, the transfer occurred in Venezuela, and arose from an employer/employee relationship established and maintained in Venezuela. Second, Defendant Farias' assignment of her future works to Plaintiff RCTV was made by operation of Venezuelan law pursuant to the presumption articulated in Article 59 of the VCL. Plaintiff RCTV's right to exploit the works at issue did not originate under the United States' work for hire doctrine. Thus, the law which gave rise to the transfer should govern that transfer. Under the facts of this case, United States law should not be used to alter the ownership of the copyrights which were assigned by operation of law

where the employee works in Venezuela, the employer is located in Venezuela, the works were created in Venezuela, and the law which gave rise to the assignment is Venezuelan law.  Otherwise, if United States law was applied to the assignment of rights without regard to the law of the country where the transfer was made by operation of law, then, as noted by the Defendants, an assignment by operation of law that would otherwise be limited in duration, could have life beyond the operation of the very law that created the transfer.

On this point, Plaintiff argues that this Court should interpret the holding in *Dish Network* broadly and find that the case stands for the proposition that United States law also governs transfer determinations in copyright cases brought in the United States. ECF No. [169] at 21-22.  However, Plaintiff's contention is unpersuasive. First, as an unpublished, Middle District of Florida decision, *Dish Network*'s holding is not binding on this Court. *Dish Network* is persuasive authority at best. Second, Plaintiff incorrectly frames *Dish Network*'s holding. Plaintiff argues that *Dish Network* held that U.S. law always governs issues of transfer of copyright ownership. ECF No. [169] at 21-22. However, *Dish Network* merely extended *Itar-Tass*' Second Restatement of Conflict of Laws reasoning to determine whether U.S. law applied to its specific transfer of ownership dispute. 2014 WL 6685351, at *3. *Dish Network* did not conclude that U.S. law *always* governs over *every* issue of transfer regarding copyright ownership.

Third, a universal conflict of laws rule for transfer of copyright ownership is untenable. *Itar-Tass* cautioned against a sweeping rule of conflict of laws in determining every permutation of copyright ownership. *Itar Tass*, 53 F.3d 90-91; *see also* Restatement (Second) of Conflict of Laws § 6 cmt. c ("Statement of precise rules in many areas of law is made even more difficult by the great variety of situations and of issues. . .") [hereinafter Second Restatement]. Although *Itar-Tass* and its progeny have recognized a universal conflict of law rule for initial copyright ownership, *see, e.g., Saregama*, 635 F.3d

at 1292, the same cannot be said for transfer of ownership. Thus, conflict issues regarding transfer of copyright ownership should be resolved on a case-by-case basis.

Finally, *Dish Network* is itself unpersuasive because it engaged in a conflated analysis. The second circuit in *Itar-Tass* warned of the ease with which the distinct issues of ownership and scope of protection can blur together. 53 F.3d at 89. In applying the Second Restatement section 6 factors, the court in *Dish Network* conflated issues of property and contract law (transfer regarding ownership) with issues of tort law (copyright infringement).  2014 WL 6685351, at *3. For example, in reaching its conclusion that U.S. law governs its conflict issue of transfer of copyright ownership, the court in *Dish Network* heavily relied on the infringement action's jurisdictional basis, *id.* ("Dish Network's cause of action is grounded in the Copyright Act-a United States statute"); the potential scope of protection, an infringement issue, *id.* ("Dish Network's exclusive rights are limited to the United States"); and the location of where the infringement occurred, *id.* ("the infringement occurred within the United States"). Although these arguments would be extremely relevant when deciding which source of law governs a conflict issue of infringement, none of these arguments are pertinent to a conflict issue regarding transfer of ownership. Examples of pertinent facts include the location of where the transfer of ownership was contracted and negotiated; the location of where the contract would ultimately be performed; and the domicile, residence, nationality, and incorporation of the parties *at the time of the transaction*. *See* Restatement (Second) of Conflict of Law § 188(2). *Dish Network*'s analysis is thus unpersuasive.

Therefore, this Court rejects the Plaintiff's broad interpretation of *Dish Network*'s holding and instead engages in its own Second Restatement analysis, which includes evaluating the parties' contracted Venezuelan choice of law provision.  Based upon an evaluation of the factors set forth in the Restatement, the Court finds that Venezuelan

copyright law governs the issue of transfer of the copyright and the scope of that transfer.  First, as pointed to by the Defendants, the parties agreed that Venezuelan copyright law would govern the copyright assignment, and the Second Restatement recognizes that contracted choice of law provisions generally supersede all other factors, Second Restatement § 244 cmt. c.

Although the Second Restatement of Conflict of Law section 6 sets out general factors to consider when determining which state has the most significant relationship towards a given issue, different areas of law place varying degrees of emphasis on each factor. Second Restatment § 6 cmt. c ("Varying weight will be given to a particular factor, or to a group of factors, in different areas of choice of law"). For example, the parties' justified expectations factor has little-to-no weight in tort issues, such as what remedy follows a copyright infringement. *Id.* § 145 cmt. b ("the protection of the justified expectations of the parties, which is of extreme importance in such fields as contracts, property, wills and trusts, is of lesser importance in the field of torts"). By contrast, the parties' justified expectations have great weight in property and contract issues, especially in conveyance of property issues. *Id.* § 222 cmt. b ("protection of the justified expectations of the parties is of considerable importance in the field of property"). For example, a contracted choice of law provision would likely govern issues of an obligation's nature, such as contractual gap-filling rules of an assignment's duration. *Id.* § 187 cmt. c; *see also id* § 188 cmt. b.

Moreover, if the parties in a conveyance *expressly* agreed that a particular choice of law would govern over a contract, the parties' justified expectations factor generally supersedes all other Second Restatement of Conflict of Law section 6 factors. *Id.* § 244 cmt. c ("Sometimes, [parties] will intend that the validity of a conveyance . . . should be determined by the local law of a particular state. In this event, the local law of this state will be applied, subject to the qualifications stated in the rule of § 187"). More

24

specifically, contracted choice of law provisions will govern issues that the parties "could have resolved by an explicit provision in their agreement directed to that issue," such as an agreement's duration. *Id.* § 187(1). Likewise, contracted choice of law provisions will still govern issues that "the parties could not have resolved by an explicit provision in their agreement directed to that issue," such as a statutory limit on an agreement's term, unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* § 187(2).

Based on the foregoing, the Court concludes that Venezuelan law governs the issue of the assignment's contractual duration. An assignment's contractual duration is an issue that the parties "could have resolved by an explicit provision in their agreement directed to that issue." *See id.* § 187(1). The parties' expressly chosen state governs such conflict of law issues. *Id.* Although the 2001 Writer's Work Agreement sets a one-year term on the work agreement, it is silent on the assignment of rights' duration. Further, both Plaintiff and Defendant agreed that the legislated laws of Venezuela would govern the 2001 Writer's Work Agreement. Thus, this Court finds that the contracted Venezuelan choice of law provision governs the issue of the assignment's duration.[15]

Moreover, this Court finds that Venezuelan law also governs the issue of statutory limits on *Juana La Virgen*'s copyright assignment. A statutory limit on an agreement's duration is an issue that "the parties could not have resolved by an explicit provision in

---

[15] The same analysis applies to all of the works created under the other employment agreements.

their agreement." *Id.* § 187(2). Contracted choice of law provisions govern such non-resolvable issues unless "the chosen state has no substantial relationship to the parties or transaction" or another state "would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* §§ 187(2)(a)-(b). First, at the time of contracting, both Plaintiff and Defendant were domiciled in, and nationals of, Venezuela; the transaction and its negotiations took place in Venezuela; and the performance of the contract was to, and did, take place in Venezuela. Thus, Venezuela has a "substantial relationship" to both the parties and the transaction. *See* Second Restatement § 187(2)(a). Second, the place of contracting, negotiations, performance, subject matter, as well as the domicile, residence, nationality, and incorporation of either party were all, at the time of the transaction, Venezuela. *See id.* § 188(2); *see also id.* § 188(3) (noting, as in the present case, "if the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied"). Thus, there is no other state that "would be the state of the applicable law in the absence of an effective choice of law by the parties." *See id.* § 187(2)(b). This Court accordingly finds that the contracted Venezuelan choice of law provision governs the statutory limit for the assignment's duration.

Accordingly, the undersigned concludes that Venezuelan law applies to the assignment in this action.

VI. **Application of Venezuelan Law to Assignment of Copyright**

A. **The Positions of the Parties**

The Court must now determine the scope and duration of the transfer under the applicable Venezuelan law. Although the Parties agree that if Venezuelan law applies, the application provisions are set forth in the statutory VCL, they disagree as to which provisions of the VCL apply to Defendant Farias' assignment of her rights to RCTV and the effects of those provisions on that assignment. Generally, Plaintiff RCTV contends

that the under Article 59 of the VCL, Defendant Farias assigned her rights to exploit Juana and other works to RCTV, for the entire life of the copyright, which pursuant to Article 25 is for 60 years after the death of the author.  Defendants on the other hand, contend that Article 52, which limits assignments in future works to five years, is applicable to Article 59, and thus limits Defendant Farias' assignment of her right to exploit the copyright to RCTV to five years.  Under the Defendants' scenario, because more than five years have passed, RCTV's right to exploit the copyright by way of assignment has expired, and the right to exploit has reverted to Defendant Farias, the author of the copyrighted work.

In support of their respective positions, as discussed in detail below, the Parties have submitted the opinions and testimony of experts on Venezuelan law and the VCL in order to aid the Court in determining who currently owns the right to exploit the copyrights at issue.[16]

### B.  Venezuelan Copyright Law (VCL)

Several provisions of the VCL are at issue in this case. The 1993 VCL, which governs this case, provides the relevant provisions:

PART III
EXPLOITATION OF THE WORK BY THIRD PARTIES

Chapter 1 General Provisions

*Section 1*

*Scope of Forms of Assignment of Exploitation Rights*

---

[16] When analyzing foreign law, the district court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. *Trinidad Foundry & Fabricating v. M/V K.A.S. Camilla*, 966 F.2d 613, 615 (11th Cir. 1992); Fed .R. Civ. P. 44.1. Examples of such sources are relevant statutes, caselaw, and affidavits submitted by attorneys with a thorough knowledge of the foreign law. See, e.g., *Trinidad Foundry & Fabricating*, 966 F.2d at 615–16 (analyzing affidavits of members of the English bar and English caselaw to determine applicable English law).

. . .

52. The assignment of the author's exploitation rights in his future works shall be valid if those works are specified individually or by genre;  the assignment shall be effective only for a maximum period of five years counted from the date of the contract, even where the latter has specified a longer period.

. . .

### Section 5

**Rights in Works Created in the Course of Employment Relations or on Commission**

59.  It shall be presumed, unless expressly agreed otherwise, that the authors of works created in the course of employment relations or on commission have assigned to the employer or commissioning party, as the case may be, without limitation and for the entire duration thereof, the exclusive right to exploit them as defined in Article 23 and contained in Part II of this Law.[17]

. . .

The VCL also provides the following:

### PART I
### PROTECTED RIGHTS

. . .

### Section 3
### Audiovisual Works

. . .

15. It shall be presumed, unless expressly agreed otherwise, that the authors of the audiovisual work have assigned to the producer, without limitation and for the entire duration thereof, the exclusive right to exploit the audiovisual work, as defined in Article 23 and contained in Part II, including their consent to his exercise of the rights referred to in Articles 21 and 24 of this Law, and also to his right to decide on disclosure.

Without prejudice to the rights of the action, the producer may, unless otherwise provided, exercise in his

---

[17] Article 23 states that the author may exploit his work in whatever way he sees fit and to derive profit, from that exploitation, subject to certain exceptions that are not relevant to this case.

> own name the moral rights in the audiovisual work to the
> extent necessary for the exploitation thereof.

Similarly worded provisions are set forth in Article 16 (Broadcast Works) and Article 17

(Computer Programs).

### Section 2

### Terms of Copyright

> 25.  Copyright shall subsist for the lifetime of the
> author and shall expire after 60 years counted from January 1
> of the year following his death, including the copyright in
> works not disclosed in his lifetime.

### C.  The Parties' Experts on Venezuelan Law

#### 1.    Plaintiff's Expert Ricardo Alberto Antequera Hernandez

The Plaintiffs' Expert, Ricardo Alberto Antequera Hernandez, "Antequera" has

submitted a Sworn Statements dated August 1, 2014, and rebuttal statements dated

September 17, 2014 and September 10, 2015, regarding his interpretation of Venezuelan

Copyright Law, ECF Nos. [112-1], [112-3], [195-1], and also was deposed in this matter,

ECF No. [112]. In his initial statement, Antequera states that he is a Venezuelan attorney

who has been practicing for twenty-one years and has been a partner in a law firm since

1997, ECF No. [112-1].  Antequera's practice is focused on all aspects of Intellectual

Property, Entertainment Law and Advertising, ECF No. [112-1] at 3.  He states that he

obtained a degree of Specialist in Intellectual Property in 1999 at Universidad de los

Andes and is currently a professor of Intellectual Property at that institution.

In his statement, Antequera opines, upon analyzing the 1989, 2000 and 2001

employment contracts, that the literary work at issue was created as part of the

obligations imposed on Perla Farias under the contracts with her then-employer RCTV,

and that those works belong to RCTV, ECF No. [112-1] at 13.  Antequera thus asserts that

Article 59 of the VCL is the applicable provision in this case and is equivalent to the "work for hire" provision of the United States Copyright Act under 17 U.S.C. § 201 (b), ECF No. [112-1] at 13.  Thus, Antequera concludes that RCTV is the sole and exclusive owner of the economic right to exploit Juana, Mis Tres Hermanas, and Piel, ECF No. [112-1] at 14.[18]

As to the original ownership of the works, Antequera asserts that pursuant to Articles 7 and 19 of the LSDA[19], ownership vests in the author, as the creator of the work, ECF No. [112-1] at 5.  As to derivative ownership, or the transfer of the copyrights in the work to a third party, Antequera states that pursuant to Articles 15, 16 and 17 of the LSDA, a legal presumption of transfer applies to audiovisual works, radiophonic works and computer software, respectively, and asserts that similarly in an employment contract, pursuant to Article 59 of the LSDA, a legal presumption of transfer to the third party (employer) arises.

Antequera explains that Article 52, which limits the duration of future assignment to a maximum term of only five (5) years, "applies to all relationships where a presumption of an assignment has not been established by operation of law" either under Article 59, 15, 16 or 17, ECF No. [112-1] at 7.  Antequera opines that Article 52 of the VCL applies when there is no contractual or labor relationship between the parties despite an assignment of an author's rights in his/her future works. Antequera denies that Article 52 applies to all future works including those that fall under Article 59 because pursuant to that Article all assignments are by their nature assignments of

---

[18] Although there is a factual dispute between the Parties regarding Defendant Farias' contribution to the various works and partial ownership of those works, the undersigned need not address that question at this stage of the proceedings.

[19] The VCL is referred to by both the Plaintiffs' and Defendants' expert as the LSDA which is an acronym for the Venezuelan law of copyrights, "Ley sobre el Derecho de Autor." ECF No. [112-1] at 4, n. 3.

future works created during the employment relationship and "are clearly designated 'unlimited' and 'for the entire duration thereof'", ECF No. [112-1] at 8.  Antequera thus concludes that Article 52 and 59 are mutually exclusive, and Article 52 does not apply to works created in the scope of an employment relationship.  Antequera asserts that this interpretation is supported by the preamble of the 1993 version of the LSDA which addresses the transfer of all economic rights to the employer pursuant to Article 59, ECF No. [112-1] at 9. Antequera further contends that Article 59 is the same in this regard as Articles 15, 16 and 17, and asserts that if Article 52 was applied in the Article 59 context and limited the employee assignment to five (5) years, it would totally change the circumstances and spirit under which the Venezuelan Copyright regimen was amended in 1993, ECF No. [112-1] at 9.

Further, Antequera notes that the employment contracts at issue specifically refer to Article 59 in section 2.0 and not to Article 52, and thus transferred any and all economic rights of the writer to RCTV pursuant to Article 59, ECF No. [169-2] at 3. Antequera observes that this reading is consistent with the inclusion of a reference to section 7.0 of the contracts which assign all audiovisual rights to the producer, under the presumption set forth by Article 15 of the VCL.

In the second rebuttal report by Antequera, ECF No. [195], he reasserts that the 1993 version of Article 59 is the equivalent of the work for hire doctrine in the United States, and by its plain language provides for an assignment to employers for the duration of the life of the copyright, i.e., 60 years plus the life of the author.  Antequera reiterates the Plaintiff's contention that support for this analysis is found in the other presumptions stated in Articles 15, 16, and 17 that use the same language as Article 59 and provide a balance between the author's rights and the business realities associated with the production and exploitation of literary, audiovisual, and broadcast works, as well as, computer software.

## 2. __Defendant's Expert Jose Rafael Farinas Diaz__[20]

Defendants' expert, Jose Rafael Farinas Diaz, is a Venezuelan university professor and the Director General of the Society of Authors and Composers of Venezuela (SACVEN).  Farinas Diaz has submitted an opinion dated May 5, 2015, ECF No. [176-1] at 29-51.  Among other things, Farinas Diaz has published articles dealing specifically with the conflict between Articles 52 and 59.

In his opinion, Farinas Diaz explains that Articles 15, 16, 17 and 59 of the VCL set forth rebuttable presumptions concerning the assignment of exclusive exploitation rights to various persons and/or entities, ECF No. [176-1] at 30.  He further explains that the presumptions provide those who are holders of the rights by operation of the law the exclusive right to exploit the works through various means. Farinas Diaz opines that pursuant to Article 59, works created under an employment relationship are presumed to be subject to an assignment to the employer, that is unlimited in both the modes of exploitation and the duration of protection, unless otherwise agreed by the parties. However, Farinas Diaz contends that Article 52 provides a limit on this otherwise unlimited assignment in regard to the assignment of exploitation rights over future works by an author.  Farinas Diaz posits that Article 52 limits the duration of the assigned right to exploit future works to five years from the date of the contract, even though the terms of the agreement provide for a longer period. _Id._ at 32.

In his statement, Farinas Diaz generally contends that the limitation on future works has been unaltered and remained consistent through three iterations of the VCL, which indicates the Venezuelan legislature's commitment to such a limitation.  However, Farinas Diaz acknowledges that the amendments in 1993 to the VCL created a conflict

---

[20] Because the undersigned granted the Defendants' Motion to substitute Mr. Farinas Diaz for Mr. Marturet as Defendants' expert on Venezuelan law, the undersigned does not consider opinions expressed in the report or deposition of Mr. Marturet in evaluating the opinion and testimony of Farinas Diaz.

between Article 59 and 52, because the prior iteration of Article 59 specifically stated that the other Articles in the law did not apply to unlimited assignments and thus did not alter the unlimited nature of the assignment to the employer regarding the right to exploit an author's future works.  However that proviso, which excluded the application of Article 52, was omitted from the 1993 version of Article 59.  Farinas Diaz opines that the conflict can only be resolved by resorting to other portions of the VCL, which make clear that no provisions shall be construed in such a way to undermine the protection of authors, and as provided in Article 90, in the case of a conflict, the rule most favorable to the author shall prevail.  *Id.* at 40.   Farinas Diaz describes the protection of authors concept as "in dubio pro auctoris" which aims to ensure that authors retain their moral and economic rights to created works that they have themselves created. *Id.* at 39.  Farinas thus contends that the only purpose of Article 52 is to limit the unlimited assignment of future works, created under an employment relationship as established in Article 59, ECF No. [176-1] at 42.

Farinas rejects the contention that the final clause in the former iteration of Article 59 was omitted from the 1993 version because Article 52 automatically does not apply to special cases of unlimited assignments, ECF No. [176-1] at 51.  On this point, Farinas argues that if this were true, there would have never been a need to include that last statement in the original Article 59, as it contained the same presumption of unlimited assignment of exploitation rights of works created under an employment relationship, ECF No. [176-1] at 43.

D.  <u>Analysis</u>

For the following reasons, the undersigned finds the arguments advanced by the Plaintiff in regard to the interpretation of Articles 52 and 59 under the VCL persuasive.  Specifically, the plain language and structure of the VCL, the 1993 amendments to the VCL, and the opinions and testimony of the experts convince this Court that the

33

assignment by Defendant Farias to RCTV of her rights to exploitation of Juana under Article 59, was without limitation, for the entire duration of the copyright, and thus expires after 60 years from January 1 of the year following the death of the author.

First, the express language of Article 59 provides that there is a presumption of an assignment by the author of works created in the course of employment to the employer, without limitation and for the entire duration thereof, unless agreed otherwise.  There is no ambiguity in that Article standing alone. This conclusion is confirmed by the fact that the Defendants do not contend that there is any such ambiguity with regard to Articles 15, 16 and/or 17 which use the exact wording "without limitation and for the entire duration thereof," and concede that as to those articles, the assignment does not expire until 60 years from January 1 of the year following the death of the author.  This same conclusion was reached by both the Defendants' expert, Farinas and Plaintiff's expert, Antequera.  Thus, on its face there is no ambiguity in Article 59 standing alone.

In addition, Article 59 is the only Article contained in "Section 5" of Chapter 1 of Part III of the VCL.  Section 5 is entitled, "Rights in Works Created in the Course of Employment Relations or on Commission," and Article 59, which only addresses the assignment of exploitation rights from an employee to employer and those hired to work on commission, provides that the duration of the assignment presumed by that Article is without limitation and for the duration thereof.  Article 52, which appears in "Section 1" of that Chapter, on the other hand, applies generally to assignments for exploitation in future works and makes no specific reference to the relationship between employees and employers.  It is illogical that the unlimited assignment established in Article 59 that is specifically directed to the employment relationship would then be limited by the general limitation to all future works assignments contained in a separate section of that Chapter.  On this point, the application of the general rule of statutory construction, that if two provisions conflict, the more specific provision applies, (lex sepecialis deroga legi

generali) is seemingly appropriate.  See *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."); *Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009) ("The canon is that a specific statutory provision trumps a general one.").

Further, it is clear, and is conceded by both Parties and their experts, that prior to the 1993 Amendments to the VCL, Article 59 included language that specifically excluded that application of Article 52 to assignments made pursuant to Article 59.  Thus, prior to 1993, Defendants would have been foreclosed from asserting that Article 52 limited author's assignments in future works to their employers to a duration of five years.  The question thus becomes whether the failure to exclude the application of Article 52 in the 1993 version of Article 59 necessarily means that Article 52's durational limitation now applies to Article 59.  As argued by the Plaintiff and left unrebutted by the Defendants, Article 59 was significantly rewritten in the 1993 amendments, ECF No. [197] at 26-27. That rewrite included the addition of the phrase "for the entire duration thereof", a clause that had not been contained in the previous version of that Article, ECF No. [197] at 26-27.  As discussed above, that same phrase has been interpreted to refer to the life of the copyright as defined in Article 25 of the VCL.  As such, there was no need to include the clause that excluded Article 52, as the duration of the assignment necessarily is that of the life of the copyright.

Finally, the undersigned finds Mr. Farinas' opinion and testimony not persuasive for a number of reasons. First, Mr. Farinas was deposed in this matter and was specifically questioned about articles he had authored prior to his involvement in the instant action.  Among other things, those articles stated that if an author agreed to a contract which included an assignment pursuant to Article 59, that author could, in essence be assigning away the right to exploit the author's copyright for the entire term

of that copyright, i.e. the rest of his life plus 60 years after his death, ECF No. [196-1] at 1-55.  During the course of the deposition, Mr. Farinas attempted to mitigate the significance of his earlier writings by suggesting that the articles merely provided general advice and only were meant to caution that a literal reading of Article 59 might yield such a result, ECF No. [196-1] at 31-32, 43, 53, 54.  In other words, Mr. Farinas contended at his deposition that his prior statements regarding the possible impact of Article 59 did not reflect the true meaning and/or proper interpretation of Article 59, but rather only provided a possible misinterpretation of the VCL or the employment contract of which authors should be wary, ECF No. [196-1] at  49, 50-51, 54.  In addition, Mr. Farinas contended that Article 52 acts as a correction to the "injustice" to an author who may transfer his rights for his entire life plus 60 years after he dies to his employer, ECF No. [196-1] at 55-56.  Ultimately, Mr. Farinas agreed that the literal translation of Article 59 is that the author has transferred the subject rights in an unlimited fashion, ECF No. [196-1] at 62. Mr. Farinas thus agreed that the Article 59 phrase "without limitation and for the entire duration thereof" standing alone means that it refers to the entire duration of the copyright, ECF No. [196-1] at 123-24. Thus, in this regard, the Defendants' own expert does not agree with the Defendants' assertion that "for the entire duration thereof" refers to the duration of the assignment described in Article 52, and not the life of the copyright.

In this same vein, in his deposition, Mr. Farinas explained that although in a portion of his written report he observed that in Venezuela, authors who create works under an employment relationship are, among other things, assigning their rights to exploit the work in an unlimited fashion for their lives plus sixty years, he was merely explaining the realities of the way the contracts are viewed as distinguished from the right of authors to utilize other mechanisms including Article 52, ECF No. [196-1] at 64-66, 71-72, 74.

36

Further, although Farinas finds support for his position in Article 90 of the VCL, there is no indication that Article 90, which is included in "Part IV Rights Neighboring on Copyright" was intended to apply, or otherwise affect, Article 59 which is contained in "Part III Exploitation of the Work by Third Parties" of the VCL.  In this regard, the undersigned notes that the word "part" is used in the translation provided to the Court in Article 90 rather than the word "title" which is contained in the opinion submitted by Farinas Diaz. *Id.* at 40.   Moreover, the undersigned finds it significant that "in dubio pro auctoris" concept which Farinas Diaz points to in related rights in the VCL is not expressly contained in Part III and in regard to the exploitation of work to third parties.

Accordingly, the undersigned discounts the opinion and interpretation of Farinas Diaz in interpreting the VCL generally, and as to the interplay between Articles 52 and 59, specifically.   On the other hand, the undersigned credits the testimony and opinion of Plaintiff's expert Antequera, as his opinions were cogent, logical and consistent.

Finally, the undersigned concludes that the Defendants' policy arguments regarding the fairness to authors, and the ability of employers to renegotiate its contracts with its employers who create future works during their employment do not persuade this Court that its statutory interpretation of Article 59 under the VCL is incorrect.  It is not for this Court to second guess whether the legislature of Venezuela was wise or just in crafting the VCL in the manner it did; rather, it is only for this Court to interpret the applicable provisions of the VCL as written and apply that interpretation to the facts in this case.[21]

For the reasons stated above, the undersigned concludes that Article 52 does not limit the durational term and scope of Article 59 under the VCL.  As such, the Court concludes that Farias' assignment of the right to exploit the copyright made pursuant to

---

[21] While the Court is aware of and comprehends the focus of the VCL on the rights, moral and otherwise, of the author, that emphasis does not alter the interpretation of the Articles at issue in this case.

Article 59, as well as, through the written contracts between the Parties, is not limited to 5 years, but rather will not expire until 60 years after her death.

    **VII.**   <u>**CONCLUSION**</u>

    Based on the foregoing, it is

    **ORDERED AND ADJUDGED** that Plaintiff RCTV's Motion for Summary Judgment, ECF No. [169] is **GRANTED**.  It is further

    **ORDERED AND ADJUGED** that Defendants Farias and Rosenfeld's Cross Motion for Summary Judgment, ECF No. [176] is **DENIED**.  It is further

    **ORDERED AND ADJUGED** that Plaintif/Counter Defendant RCTV International Corp., as the employer, owns the copyrights to the audiovisuals and scripts of Juana La Virgen, Rubi Rebelde, Cambio de Piel, Anabel, Mis Tres Hermanas, and Ser Bonita No Basta created during the course of employment of Defendant Perla Farias De Eskinazi.[22]

    **DONE AND ORDERED** in chambers in Miami, Florida, on September 30, 2016.[23]

_____
**ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE**

---

[22]  It is unclear from the record which of these works have been licensed to RCTV Miami, and it is unnecessary to make this determination for the purposes of this Order.  See ECF No. [176] at 3-4.

[23] As mentioned above, the Parties have indicated that they will likely seek an immediate appeal of the undersigned's ruling on the Motions for Summary Judgment.  Jurisdiction for an immediate appeal under 28 U.S.C. § 1292(b) is discretionary.  Courts have identified five conditions that generally must be met before an issue will be considered on interlocutory appeal: (1) the issue is a pure question of law, (2) the issue is controlling of at least a substantial part of the case, (3) the issue was specified by the district court in its order, (4) there are substantial grounds for difference of opinion on the issue, and (5) resolution may well substantially reduce the amount of litigation necessary on remand. *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016).  If the Parties intend to seek an immediate appeal, the Parties shall timely file a Motion seeking such relief from the undersigned which addresses the relevant factors.

**Copies furnished via CM/ECF to:**

**All counsel of record**